```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NORTH DAKOTA
 2                     EASTERN DIVISION

 3                         Case No. 3:17-cr-206-03

 4

   United States of America,          )
 5                                     )
                         Plaintiff,    )
 6                                     )
                  vs.                  )
 7                                     )
                                       )
 8   Anthony Santos Gomes,             )
     aka Ant,                          )
 9                                     )
                         Defendant.    )
10   _____)

11

12              T R A N S C R I P T

13                     OF

14            P R O C E E D I N G S

15                (Plea Hearing)

16

17                   Taken at:
            Quentin N. Burdick U.S. Courthouse
18               655 First Avenue North
                  Fargo, North Dakota
19

20                  May 14, 2018
                     3:10 p.m.
21

22

23    BEFORE:  Honorable Brian S. Miller

24

25    COURT REPORTER:  Carolyn Taylor Pekas, RPR
```

```
1                      A P P E A R A N C E S

2      Christopher C. Myers, Esq.
         UNITED STATES ATTORNEY
3        Office of the United States Attorney
         Quentin N. Burdick United States Courthouse
4        655 First Avenue North, Suite 250
         Fargo, North Dakota 58102-4932
5        (701) 297-7400
         chris.c.myers@usdoj.gov
6      COUNSEL FOR PLAINTIFF

7      Steven R. Morrison, Esq.
         1526 Robertson Court
8        Grand Forks, North Dakota 58201
         (617) 749-7817
9        steven.r.morrison@gmail.com
       COUNSEL FOR DEFENDANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2          (May 14, 2018.  The following proceedings

3    commenced at 3:10 p.m.)

4               THE COURT:  The last case on the docket for

5    today is United States of America vs. Anthony Gomes.

6    The case number is 17-cr-206.

7               Mr. Gomes is in the courtroom with his

8    lawyer, Steven Morrison.  I have on here Bruce

9    Ringstrom or Steven Morrison, so I've been up here

10   asking who is who.

11              You are Mr. Morrison?

12              MR. MORRISON:  You've got it right, Your

13   Honor.

14              THE COURT:  No, I didn't get it right.  I

15   had help.

16              And the United States is being represented

17   by Christopher Myers.

18              Mr. Gomes, would you stand and raise your

19   right hand so we can swear you in?

20              **ANTHONY SANTOS GOMES**, having been first duly

21   sworn to tell the truth, the whole truth, and nothing

22   but the truth, testified as follows:

23              THE COURT:  Mr. Gomes, how old are you?

24              THE DEFENDANT:  33.

25              THE COURT:  And how much education do you

1      have?

2                THE DEFENDANT:  Graduated high school.

3                THE COURT:  And have you had any drugs or

4      alcohol or any type of medication today --

5                THE DEFENDANT:  No, I haven't.

6                THE COURT:  -- that would make it difficult

7      for you to understand what we're doing?

8                THE DEFENDANT:  No, not at all.

9                THE COURT:  Okay.  And do you fully

10     understand why you're in the courtroom this

11     afternoon?

12               THE DEFENDANT:  Yes, I do.

13               THE COURT:  Okay.  And you're being

14     represented by Steven Morrison.  Have you had a

15     chance to meet with Mr. Morrison about your case?

16               THE DEFENDANT:  Yes, I have.

17               THE COURT:  And have you had a chance to

18     discuss it with him?

19               THE DEFENDANT:  Yes, I have.

20               THE COURT:  Okay.  Are you satisfied with

21     the legal representation he's given you so far?

22               THE DEFENDANT:  Yes, I am.

23               THE COURT:  Okay.  And, Mr. Morrison, have

24     you had a chance to meet with Mr. Gomes today?

25               MR. MORRISON:  Yes, Your Honor.

1              THE COURT:  Is there anything about him that

2     would lead you to believe he's not competent to go

3     forward with this plea?

4              MR. MORRISON:  No, Your Honor.

5              THE COURT:  Okay.  I find that the

6     Defendant, Anthony Santos Gomes, is competent to go

7     forward with the plea.

8              Mr. Gomes, it's my understanding that you

9     want to enter a plea of guilty -- well, waive

10    indictment to an Information and enter a plea of

11    guilty to the Information and to Count One of the

12    Superseding Indictment.  Is that true?

13             THE DEFENDANT:  That is correct.

14             THE COURT:  Okay.  I will tell you that I

15    have never had a defendant plead guilty to an

16    Information and to an Indictment at the same time,

17    and so if I confuse you at any point in explaining

18    your rights to you, just let me know and we will make

19    sure we make a good record.  Okay?

20             THE DEFENDANT:  Not a problem.

21             THE COURT:  Okay.  Now, let me do this.  I

22    am going to read the Information first.  This is what

23    you're being charged with.  It says that "From in or

24    about January 2013 to in or about August 2016, in the

25    Districts of North Dakota, Oregon, Florida, Georgia,

1     North Carolina, New Jersey, California,

2     South Carolina, Ohio, Colorado, Maryland, and

3     elsewhere, Anthony Santos Gomes did knowingly and

4     willfully combine, conspire, confederate, and agree

5     together and with others, to commit an offense

6     against the United States, specifically: to violate

7     Title 18, United States Code, Sections

8     1956(a)(1)(B)(i) and (a)(2)(B)(i), in that members of

9     the conspiracy did knowingly and intentionally

10    conduct and attempt to conduct financial transactions

11    in and affecting interstate and foreign commerce

12    within the United States by moving monetary

13    instruments from the United States to Canada and

14    China as described below, which involved the proceeds

15    of a specified unlawful activity, that is, the

16    distribution and importation of controlled substances

17    and controlled substance analogues intended for human

18    consumption."

19          And then it has overt acts.  No.  Let me

20    step back.  I just didn't want to read the statute,

21    but I guess I will.  "Title 21, United States Code,

22    Sections 802(32), 812, 813, 841, 846, 848, 952, 960

23    and 963, knowing that the transactions were designed

24    in whole and in part to conceal and disguise the

25    nature, location, source, ownership, and control of

1    the proceeds of the said specified unlawful

2    activity."

3            Now, let me ask this question before I read

4    the overt acts.  Mr. Morrison, is there any reason

5    for me to read the overt acts, or do you waive that?

6            MR. MORRISON:  We waive it, Your Honor.

7            THE COURT:  And, Mr. Myers, any reason to

8    read the overt acts?  Would you prefer that I do?  I

9    can.  It doesn't matter, but --

10           MR. MYERS:  No, Your Honor, that's fine.  I

11   will, in the factual basis, provide adequate support

12   for the entire Information.

13           THE COURT:  I understand.

14           And here's the thing, Mr. Gomes.  Normally,

15   I read the Information and the Indictment just

16   because I want to have a record the person

17   understands what he or she is entering a plea of

18   guilty to.

19           So have you had a chance to read this

20   Information?

21           THE DEFENDANT:  Yes, I have.

22           THE COURT:  Okay.  Do you understand that in

23   the federal system in the United States we can't

24   charge you by Information unless you waive

25   indictment?

1              THE DEFENDANT:  Yes.

2              THE COURT:  Do you understand that if you

3    did not waive indictment, that you would have a right

4    to have your case taken to a grand jury which

5    consists of at least 16 but not more than 23 persons,

6    and at least 12 of those grand jurors would have to

7    determine that there's probable cause to believe that

8    a crime has been committed?

9              THE DEFENDANT:  Yes.

10             THE COURT:  And what happens is the

11   Government will go into the grand jury and present

12   the Information to the grand jury, and then the grand

13   jury has to determine if there's probable cause.

14             Now, the grand jury can do a couple of

15   things or several things.  The grand jury can

16   determine there is no probable cause to indict you on

17   this count that's listed in the Information; the

18   grand jury could determine that there is probable

19   cause to indict you on the charge contained in the

20   Information; or the grand jury can come back and

21   indict you on something else that's not even listed

22   in the Information.  So there are three options, and

23   understand that any one of those could happen.  Do

24   you understand that?

25             THE DEFENDANT:  I do.

```
1              THE COURT:  Okay.  Now, have you had a

2    chance to discuss waiving grand jury with your

3    counsel?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Okay.  And do you understand

6    your right to a grand jury?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Have any threats or promises

9    been made to you to get you to waive indictment?

10             THE DEFENDANT:  No.

11             THE COURT:  And do you waive indictment

12   voluntarily?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Okay.  Now, this came up a

15   little earlier, Mr. Morrison and Mr. Myers.  In my

16   district back home, normally we have a formal waiver

17   signed off on, and I understand that in the Bismarck

18   division that happens as well.  I understand that in

19   Fargo, normally the verbal record or the record of

20   the hearing suffices for waiving indictment.  Just

21   wanted to make sure we had a record of that.

22             Is there any objection to proceeding without

23   signing off on a written waiver form?

24             MR. MORRISON:  No objection from me, Your

25   Honor.
```

1          THE COURT:  Okay.

2          MR. MYERS:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Morrison, let me ask

4    you a question.  Do you know of any reason why

5    Mr. Gomes should not waive indictment?

6          MR. MORRISON:  I do not.

7          THE COURT:  Okay.  And, Mr. Gomes, do you

8    understand your right to an indictment by grand jury?

9          THE DEFENDANT:  I do.

10          THE COURT:  And do you voluntarily waive it?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  And agree to proceed on the

13    Information?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Okay.  Now, also, so you've been

16    charged by Information, and it's also my

17    understanding that you want to enter a plea of guilty

18    to the Information and to Count One of the

19    Indictment.  Is that true?

20          THE DEFENDANT:  That is correct.

21          THE COURT:  Count One -- I thought this was

22    the one.  Count One of this Indictment, it's fairly

23    lengthy.  Normally, I would read the count so that

24    the Defendant -- so that I have a record that the

25    Defendant is aware of exactly what he's being charged

1     with and what he's entering a plea of guilty to.

2              Mr. Morrison, have you had a chance to go

3     over this Indictment with Mr. Gomes?

4              MR. MORRISON:  I have, Your Honor.

5              THE COURT:  Mr. Gomes, have you had a chance

6     to speak with Mr. Morrison about Count One of the

7     Indictment?

8              THE DEFENDANT:  Yes.  I've been over it

9     plenty of times.

10             THE COURT:  Okay.  Do you waive me reading

11    this to you?  Are you familiar with it?

12             THE DEFENDANT:  Yes, I'm very familiar with

13    it.

14             THE COURT:  Okay.  And let me ask the

15    Government, do you have any objection to me not

16    reading Count One of the Indictment?

17             MR. MYERS:  No objection.

18             THE COURT:  Because we might be here another

19    20 minutes if I decided to read all of it.

20             All right.  We'll proceed.  Now, you

21    understand, Mr. Gomes, that just because you have --

22    it's my understanding you want to enter a plea of

23    guilty to Count One.  Is that true?

24             THE DEFENDANT:  Yes, that is correct.

25             THE COURT:  Do you understand that just

1    because you waive indictment on the Information that

2    you're not required to enter a plea of guilty?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And do you also understand that

5    you're not required to enter a plea of guilty to

6    Count One of the Indictment?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And, in fact, on both the

9    Indictment and the Information, you have a right to

10   either enter a plea of guilty or stand on your plea

11   of not guilty, and if you did so, you would have a

12   right to a speedy and public jury trial?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And if we were to have a trial,

15   it would be held in either this courtroom or the one

16   next door, and we would have 12 jurors who would come

17   in from the community, just people from the

18   community, who would sit in those chairs over there

19   to your right and listen to the case, and the

20   Government would have to prove the case against you

21   beyond a reasonable doubt.  Do you understand that?

22             THE DEFENDANT:  I do.

23             THE COURT:  Do you understand that you have

24   a presumption of innocence, which means you don't

25   have to prove or disprove anything during the course

1    of the trial; and, in fact, you have the

2    constitutional right to be free from

3    self-incrimination, which means you don't have to

4    testify at all, and that the jury cannot use that

5    against you?  Do you understand that?

6              THE DEFENDANT:  I do.

7              THE COURT:  All right.  In a case like this,

8    we would probably -- the Government would probably

9    come in and put on witnesses, such as law

10   enforcement, people who bought or sold to the

11   conspiracy, or even coconspirators, if they had any.

12   Those are the types of witnesses we would hear from.

13   Considering that this is -- we do have a drug charge,

14   the Government will probably put on an expert from

15   the crime lab who would come in here and testify as

16   to what the substance is, how it affects the body,

17   the fact that it's illegal, and would probably have

18   somebody testify about it moving in interstate

19   commerce.  Do you understand that?

20             THE DEFENDANT:  I do.

21             THE COURT:  Now, the Government probably has

22   seized some drugs, probably has other documentary

23   evidence to put in; they might even have photos or

24   videos or even phone taps in some cases, and the

25   Government would want to come in here and display

1    that to the jury.  Do you understand that you would

2    have a right to object to those items coming into

3    evidence, and then I would have to decide whether

4    those items do come into evidence?

5              THE DEFENDANT:  I do.

6              THE COURT:  And do you also understand that

7    you have a right to confront the Government's

8    witnesses against you, and what that means is

9    Mr. Morrison -- when one of those witnesses

10   testifies, Mr. Morrison would then get up and

11   cross-examine them to make sure that their testimony

12   that has been given is both truthful and accurate.

13   Do you understand that?

14             THE DEFENDANT:  I do.

15             THE COURT:  Now, once the Government puts on

16   its case, then you have some decisions to make.  One

17   of those decisions is going to be whether you call

18   witnesses to testify for you.  Although you have a

19   right -- although you don't have to prove or disprove

20   anything, if you know somebody who knows something

21   about the case and you want to put them on the

22   witness stand and have them testify, you have a right

23   to do that.

24             Also, although you have a right to be free

25   from self-incrimination, if you want to sit on this

1    witness stand with the jury -- in their faces and

2    tell them what happened or what didn't happen, you

3    have a right to do that, too.  Do you understand

4    that?

5              THE DEFENDANT:  I do.

6              THE COURT:  Now, understand this, that if

7    you testify, if you call witnesses to testify, then

8    the Government has a right to cross-examine you and

9    your witnesses, also, just like you had a right to

10   cross-examine theirs.  Do you understand?

11             THE DEFENDANT:  Yes, I do.

12             THE COURT:  Now, once all the evidence is

13   in, those 12 jurors would go back to the jury room

14   and -- we say "deliberate," but all that means is

15   they'll go back there and talk about the case, and

16   they'll sit back there and they'll try to determine

17   whether the Government proved the case against you

18   beyond a reasonable doubt.

19             If the jury determines that the Government

20   did not prove the case against you beyond a

21   reasonable doubt, that jury will find you not guilty;

22   and if you're found not guilty, your case is over and

23   the Government cannot bring the case against you

24   again based on these facts.  Do you understand that?

25             THE DEFENDANT:  I do.

1          THE COURT:  Do you also understand that if

2     the jury determines that the Government did prove the

3     case against you beyond a reasonable doubt, the jury

4     will find you guilty; and if you are found guilty,

5     then you have a right to an appeal.

6          Now, if you do appeal, your case would

7     probably be appealed to three judges sitting in

8     St. Paul, Minnesota, and those judges would not hear

9     new evidence.  So if you had a witness who didn't

10    show up for trial, you can't go get a statement from

11    that witness and send it to the judges.  If you want

12    to carry a witness up to the Court of Appeals, you

13    can't do it.  All the Court of Appeals, those three

14    judges, will do is read the transcript from the

15    trial -- see how the court reporter's sitting here

16    typing?

17          THE DEFENDANT:  Uh-huh.

18          THE COURT:  She'll be at trial, too, and the

19    Court of Appeals will get a transcript of that trial,

20    and they will read it, and they'll determine whether

21    I made any mistakes during the course of your trial

22    that caused you to lose.  In the law, that's called

23    "error," but all that means is I made a mistake.  Do

24    you understand that?

25          THE DEFENDANT:  I do.

1           THE COURT:  All right.  And if the Court of

2   Appeals determines that I did not make a mistake that

3   caused you to lose, the Court of Appeals will affirm

4   the jury's verdict and your case would be over,

5   because the likelihood of getting to the Supreme

6   Court is almost zero.  Just understand that.

7           If the Court of Appeals determines that I

8   did make a mistake that caused you to lose, the Court

9   of Appeals will reverse the jury's verdict, send the

10  case back down here, and we would try it again.  Do

11  you understand?

12          THE DEFENDANT:  I do.

13          THE COURT:  Do you also understand that the

14  verdict has to be unanimous?  So if we had -- all 12

15  jurors have to agree on a verdict.  So if we had 11

16  jurors who were ruling that there was no -- that you

17  didn't violate the law and one juror who says you

18  did, we have to declare a mistrial and try it again.

19          At the same time, if we have 11 jurors that

20  find that the Government did prove the case against

21  you beyond a reasonable doubt and only one who

22  decides no, same thing.  We have to declare a

23  mistrial and start all over.  Do you understand that?

24          THE DEFENDANT:  I do.

25          THE COURT:  Okay.  Now, Mr. Gomes, do you

1    have any prior criminal history?

2              THE DEFENDANT:  Yes, I do.

3              THE COURT:  Well, I don't know what your

4    history is, so I'll give you this admonition, or I'll

5    explain this to you, that by entering a plea of

6    guilty, if you had no prior felony convictions, this

7    would affect your civil rights.  It would mean that

8    you would no longer be able to vote, own a firearm,

9    or hold elective office.  Do you understand that?

10             THE DEFENDANT:  I do.

11             THE COURT:  Do you also understand that in

12   the federal system we do not have an expungement law,

13   so by entering this plea of guilty, this will go on

14   your record, and I don't have a way of ever removing

15   it unless Congress passes a law allowing me to.  Do

16   you understand that?

17             THE DEFENDANT:  I do.

18             THE COURT:  Have you had a chance to speak

19   with Mr. Williamson about the possible sentence

20   you'll receive?

21             THE DEFENDANT:  Yes, I did.

22             THE COURT:  Mr. Morrison.  Not Mr.

23   Williamson.  Sorry, Mr. Morrison.

24             MR. MORRISON:  It's okay, Your Honor.

25             THE COURT:  William Morris, maybe?  I don't

1    know where I got that from.

2            Mr. Morrison has probably gone over all of

3    this with you, and I'll tell you, Mr. Gomes, I think

4    this is my seventh hearing today, and it sounds like

5    just a loop on a recorder; but the truth is, I have

6    to tell you these things, and we have to make a

7    record of it so that the Court of Appeals, if ever it

8    looks at it, will know that I told you all of this.

9    So --

10           THE DEFENDANT:  I understand.

11           THE COURT:  -- I'm sure that Mr. Morrison

12   has told you that in the federal system we have a law

13   that tells me what the minimum and maximum sentences

14   are I can give you.  I have to give you a sentence

15   within the range provided by the law.  Do you

16   understand that?

17           THE DEFENDANT:  I do.

18           THE COURT:  But in addition to the law, we

19   have sentencing guidelines to help me determine what

20   the appropriate sentence is for you.  I am not

21   required to give you a sentence within the range

22   provided by the guidelines.  Do you understand that?

23           THE DEFENDANT:  I do.

24           THE COURT:  Okay.  And although I think your

25   plea agreement might have what your guideline range

1    and all that is, that's not the official calculation,

2    so I will tell you that I do not have your guideline

3    range, and I don't know what that is right now until

4    probation looks at your background and sees what your

5    criminal history is --

6            THE DEFENDANT:  Uh-huh.

7            THE COURT:  -- but I do have the law that

8    tells me what your sentencing range is based on the

9    law.  The statutory penalty for Conspiracy to Commit

10   Money Laundering is not more than 20 years of

11   imprisonment, a fine of not more than $500,000, not

12   more than three years of supervised release, and a

13   mandatory $100 special assessment.  Do you understand

14   that?

15           THE DEFENDANT:  I do.

16           THE COURT:  And the penalty for Conspiracy

17   to Possess with Intent to Distribute and Distribute a

18   Controlled Substance and Controlled Substance

19   Analogues Resulting in Serious Bodily Injury and

20   Death is not less than 20 years of imprisonment and

21   not more than life of imprisonment, a fine of not

22   more than $2 million, not less than five years of

23   supervised release, and a mandatory $100 special

24   assessment.  Do you understand?

25           THE DEFENDANT:  I do.

1          THE COURT:  Okay.  Do you understand that if

2     I end up giving you a sentence that's longer than

3     what you expect, that you cannot withdraw your plea

4     of guilty?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  Do you understand that we

7     don't have parole in the federal system, so whatever

8     amount of prison time you get, you will not go before

9     a parole board at some point and get out early?

10         THE DEFENDANT:  I do.

11         THE COURT:  Okay.  I understand there is a

12    plea agreement.  Would the Government state for the

13    record what the basic terms of the agreement are?

14         MR. MYERS:  Yes, Your Honor.  The basic

15    terms are, as the Court noted, the Defendant will

16    plead to the Information and Count One of the

17    Indictment.

18         We've outlined in the agreement the

19    guideline range that we've agreed upon, plus some

20    enhancements.  I don't know how detailed, Judge, you

21    want me to go through that.  I sure can.

22         THE COURT:  You don't have to go through

23    everything.  I just want the basics.

24         MR. MYERS:  Yeah.  And there's also a

25    provision for substantial assistance in this

1   particular case, and as part of that supplement,

2   we've agreed to withdraw two prior felony drug

3   convictions as part of this particular agreement.  So

4   that, generally, is the --

5          THE COURT:  What does the plea agreement say

6   with regard to appeal rights?

7          MR. MYERS:  There's a standard waiver of

8   appeal rights contained in this particular plea

9   agreement.

10          THE COURT:  And, Mr. Morrison, do you have

11   anything to add to that, that you just want to put on

12   the record?

13          MR. MORRISON:  Nothing in particular except

14   that I'm grateful that the Government is willing to

15   withdraw the two prior felony drug convictions.  I

16   know that's relatively unprecedented.

17          THE COURT:  All right.  Mr. Gomes, did you

18   listen to the statement given by the U.S. Attorney?

19          THE DEFENDANT:  Yes, I did.

20          THE COURT:  Okay.  Were those the terms you

21   understood were contained within the plea agreement?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.  Having discussed your

24   rights with you, do you still want to enter a plea of

25   guilty?

1         THE DEFENDANT:  Yes, I do.

2         THE COURT:  Have any promises or any threats

3    been made to you to get you to plead guilty?

4         THE DEFENDANT:  No.

5         THE COURT:  Are you pleading guilty because

6    it's either what you want to do or it's in your best

7    interests?

8         THE DEFENDANT:  Yes.

9         THE COURT:  All right.  Mr. Myers, would you

10   state for the record what the facts would show if we

11   were to have a trial on Count One of the Superseding

12   Indictment and on the Information?

13        MR. MYERS:  Yes, Your Honor.  This is

14   somewhat of a complicated case, Judge, so I'll do the

15   best I can to summarize the evidence that would be

16   relevant to Mr. Gomes.

17        Now, this conspiracy started in 2013 and

18   2014.  Individuals in Canada, identified as Jason

19   Berry and Daniel Vivas Ceron, were housed in the

20   Drummondville Correctional Institute about an hour

21   north of Montreal.  They began -- through

22   communication devices inside the prison, began to

23   broker and receive shipments of fentanyl and fentanyl

24   analogues from China.

25        THE COURT:  You said inside the prison?

```
 1              MR. MYERS:  Inside the prison.

 2              THE COURT:  The prison is located where?

 3              MR. MYERS:  In Québec, about 70 miles north

 4      of Montreal.

 5              THE COURT:  So you had some Canadian

 6      prisoners running a drug operation out of the prison?

 7              MR. MYERS:  Yeah.

 8              THE COURT:  Okay.

 9              MR. MYERS:  That's not all.  There's more.

10              THE COURT:  What's funny is -- and maybe I

11      don't know anything because I live down in Arkansas,

12      but we often hear about how great Canada's penal

13      system is and how it works, and now I'm hearing that

14      you have a drug-dealing operation going on in the

15      prison.  And I'm not talking about somebody just

16      bringing in drugs for the prisoners to use, but the

17      prisoners in there running the operation?

18              MR. MYERS:  Right.

19              THE COURT:  Oh, wow.

20              MR. MYERS:  And these individuals had an

21      organization on the outside that was assisting them

22      in the distribution system, but they had

23      communication devices within the walls of the prison

24      and were orchestrating this particular operation.

25              Again, that started in 2013 and 2014.
```

1    Mr. Gomes, at that time, was living in Rhode Island,

2    and he and another individual started receiving

3    shipments of fentanyl to Rhode Island, and they began

4    distributing this fentanyl in the form of pills.

5    They would take fentanyl and press pills and

6    distribute them in Rhode Island.  And then the

7    Defendant moved to Florida and continued that

8    operation until his arrest in October of 2017.  And

9    so this was ongoing for quite some time.

10         During the course of this particular

11   conspiracy, Anthony Gomes and his girlfriend,

12   Elizabeth Ton, and a number of other coconspirators,

13   when receiving these shipments from Canada or

14   directly from China as brokered by the Canadians,

15   they would send Western Union or other money wires,

16   bank transfers, to individuals in Canada, and also,

17   at the end, bitcoin, virtual currency.  All of this

18   was designed to conceal the identity of the true

19   individuals running at least the Rhode Island and

20   Florida part of this particular operation.

21         Mr. Gomes and others would have

22   coconspirators or friends send the money on their

23   behalf as part of the money laundering conspiracy.

24   And that continued throughout the -- this

25   several-year period.

1          So as this was happening, Judge, in January

2     of 2015, in Grand Forks, North Dakota, which is an

3     hour north of here, an individual named Bailey Henke

4     died from a fentanyl overdose.  From that

5     investigation, law enforcement identified the local

6     traffickers in Grand Forks and arrested a number of

7     them.

8          From that particular investigation, within a

9     matter of weeks, they were able to identify one of

10     the sources of supply in Portland, Oregon, a guy

11     named Brandon Hubbard.  They conducted surveillance,

12     executed a search warrant on Brandon Hubbard, and

13     found him in possession of about 250 grams of

14     fentanyl.  Brandon Hubbard was dealing directly with

15     the same sources of supply in Canada, Berry and

16     Ceron.

17          As that investigation is happening, one of

18     Brandon Hubbard's coconspirators, his girlfriend,

19     actually, smuggled some of the fentanyl into the

20     correctional facility when she was arrested.  There

21     were three overdoses in Portland.  Two of those

22     survived, although with substantial bodily harm; one

23     of the inmates died.

24          And law enforcement in Portland initiated an

25     undercover investigation using Brandon Hubbard's

1    identification, his Wickr communication, which is an

2    application that destroys itself, designed for

3    anonymity with these traffickers.

4            Anyway, Homeland Security initiated an

5    undercover operation into the Canadian organization.

6    At least they believed it was a Canadian

7    organization.  Throughout that investigation, they

8    realized that DEA in West Palm Beach, Florida, had

9    also initiated an undercover investigation into the

10   same Canadian trafficking organization.  At some

11   point in time, we all realized we were working on the

12   same investigation and combined efforts, along with

13   RCMP in Canada.

14           These undercover investigations resulted in

15   a number of controlled buys that are listed in the

16   overt acts of the conspiracy.  Some of those

17   purchases were delivered directly to North Dakota

18   during the undercover operation, which continued

19   until the summer of 2015 when law enforcement was

20   able to isolate a time and a place where Daniel Vivas

21   Ceron had a communication device and they searched

22   his jail cell in Canada.

23           In Canada, they found him in possession of a

24   phone and also -- I guess I would call them pay/owe

25   sheets, paper documentation of all of the individuals

1    involved -- or at least many of the individuals

2    involved in the conspiracy, including some of the

3    tracking numbers and undercover names of the agents.

4          By this time, Jason Berry had been shipped

5    to a different prison in Canada, so Vivas Ceron had

6    been running it from Drummondville.  The

7    investigation continued from that point.  Vivas Ceron

8    was indicted.  He was deported to Columbia from

9    Canada.  We arrested him in Panama, and he fought

10   extradition for about 18 months in Panama.

11         During that particular time, Vivas Ceron was

12   able to get a phone in the Panamanian jail, and,

13   actually, we learned that from Mr. Gomes; and he

14   continued to deal with the Chinese from Panama, in

15   addition to Mr. Gomes and the other coconspirators,

16   as this conspiracy continued until he was extradited

17   to the United States.

18         From that -- or during this entire time,

19   Judge, from 2013 to present, law enforcement has been

20   conducting a historical investigation into the

21   drug-trafficking activities of all of these

22   individuals.

23         There were a number of witnesses through the

24   conspiracy that confirmed Anthony Gomes and Elizabeth

25   Ton and their trafficking activities during the

1       course of this particular conspiracy, among others.

2               We also uncovered an overdose death in

3       North Carolina of James Williams and two other

4       substantial bodily harm overdoses in North Carolina

5       that are attributed to this particular conspiracy.

6               We've also identified an overdose death in

7       New Jersey, Daniel Lajterman.  Both the

8       North Carolina and New Jersey overdoses are listed in

9       the Indictment.  Those happened in 2014.

10              And so that kind of summarizes the overall

11      case, Judge, as best I can.  In short, Anthony Gomes

12      was dealing directly with Daniel Vivas Ceron and the

13      Canadians in brokering transactions with the Chinese

14      during the entire time of the conspiracy.  That

15      conspiracy branched out, basically, to most of the

16      United States, including the District of

17      North Dakota; and, of course, some of the overt acts

18      occurred in North Dakota, to establish venue.

19              When law enforcement secured an arrest

20      warrant for Anthony Gomes, he was residing in

21      Florida.  Law enforcement executed a search warrant

22      at his residence in October of 2017.  He was found in

23      possession of about $162,000.  During that search,

24      there was also a letter from Daniel Vivas Ceron

25      seized in his residence that further establishes the

1       connection between these individuals.

2              The reason I mentioned the money and the

3       residence in Florida, as part of this plea agreement,

4       Mr. Gomes has agreed to forfeit the $162,836, a 2007

5       Maserati, 2016 Polaris Sportsman, and jewelry seized

6       at that particular residence in Florida valued at

7       about $64,725.

8              The investigation would -- does reveal that

9       Mr. Gomes' primary source of income, really his only

10      source of income, or at least -- was derived from

11      drug trafficking during this time frame.

12             He did set up several businesses in Rhode

13      Island and Florida during the course of the

14      conspiracy in an attempt to hide or make his

15      drug-trafficking activities appear legitimate, and

16      Mr. Gomes was one of several conspirators that did

17      that through the course of the conspiracy.

18             So I think that's an adequate factual basis,

19      Judge, to support the pleas to Count One and the

20      Information.

21             Unless the Court has any questions, I'll end

22      at this time.

23             THE COURT:  Mr. Gomes, did you listen to the

24      statement given by the U.S. Attorney?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Was his statement accurate?

2          MR. MORRISON:  Your Honor, may I take a

3    couple minutes with my client?

4          THE COURT:  You can.  Of course.

5          MR. MORRISON:  Thank you.

6          (Mr. Morrison and the Defendant confer

7    privately.)

8          MR. MORRISON:  Your Honor, before you

9    address Mr. Gomes, may I make a couple points?

10          THE COURT:  Of course.

11          MR. MORRISON:  Certainly, we're here so that

12    Mr. Gomes can change his plea, and we're not

13    contesting the elements.

14          There are a couple things that when we get

15    to sentencing we may very well contest, but that

16    certainly doesn't mean we want to go back on our

17    plea.

18          I think at this point there are two things

19    that Mr. Myers said that we would somewhat want to

20    clarify.  It was only later on that Anthony knew that

21    Ceron and Berry were operating from prison.  Early

22    on, he didn't know that.

23          I know this is -- this is a pretty big

24    conspiracy.  This is -- I mean, this is a

25    consolidated priority organization target.  Less than

1    100 have been designated in this century by the DOJ.

2    This is a pretty serious thing.  Anthony being part

3    of it is a serious thing.  But, certainly, one thing

4    we're going to do at sentencing, as anybody would, is

5    try to show his place in the overall conspiracy,

6    which compared to people like Ceron and the Chinese,

7    was relatively small.

8              Just one final point that I'd like to

9    clarify, or at least challenge at this point.

10   Mr. Myers alleged that Anthony's legitimate

11   businesses were set up to launder money.  In fact,

12   they were set up to be legitimate businesses, and at

13   sentencing we would certainly contest that they were

14   set up to launder money.  And as for that, I just

15   will let him speak for himself.

16             THE COURT:  I understand.  And your

17   statement is essentially to preserve the record so

18   that you can come back at sentencing and make those

19   arguments.

20             MR. MORRISON:  I had a client a few years

21   ago who pled guilty to wire fraud, and at sentencing

22   he challenged a lot of what the Government was

23   saying, and the Court at that point questioned

24   whether he was going back on his plea agreement.

25             THE COURT:  And from time to time I'll have

 1     a defendant who will say:  Judge, I admit that I

 2     committed the offense, but I didn't do what he just

 3     said I did; and I'm here to admit that I committed

 4     the offense, but when he says I did this, this, and

 5     this, I didn't do that.

 6              That's fine.

 7              MR. MORRISON:  Okay.

 8              THE COURT:  And then that's left for

 9     argument at sentencing.

10              Now, let me ask Mr. Myers.  Mr. Myers, you

11     know, sometimes I'll -- almost never, but sometimes

12     I'll have a U.S. Attorney say, "Judge, if he's not

13     willing to say these things, then I don't think we

14     can enter the plea."

15              I don't think that's where you are on this,

16     is it?

17              MR. MYERS:  No, Judge, not at all.  And, as

18     a matter of fact, I would agree that it's likely that

19     at least early on during the conspiracy Mr. Gomes

20     didn't know that these individuals were in prison.

21     Law enforcement didn't know for sure that they were

22     in prison until we searched his jail cell.  So I

23     think -- some of the nuances of the facts I think we

24     can leave to argue at sentencing.  The only other

25     thing -- and as long as the Defendant admits to the

1     elements of the crime, we're fine with that.

2             The one thing, Judge, that he must admit to,

3     and I think it's important to create a record of

4     that, is that the deaths and serious bodily injury

5     were reasonably foreseeable by him based on the scope

6     of the conspiracy that was occurring.  Aside from

7     that, the defense is free to argue different facts at

8     sentencing and his role and all of those things.

9             THE COURT:  What's your position on that,

10    Mr. Morrison?

11            MR. MORRISON:  I thank Mr. Myers for

12    bringing that up.  Absolutely Mr. Gomes recognizes

13    the elements of conspiracy, and *Pinkerton* liability

14    in particular, and so of course he does admit

15    responsibility for the deaths, but at sentencing we

16    will absolutely be arguing that he took steps to

17    distance himself from the danger that fentanyl poses.

18            THE COURT:  Okay.  All right.

19            MR. MORRISON:  Thank you, Your Honor.

20            THE COURT:  I think a sufficient record's

21    been made on that.

22            All right.  Mr. Gomes, did you listen to the

23    statement given by the U.S. Attorney?

24            THE DEFENDANT:  Yes.

25            THE COURT:  And did you listen to the

1    clarifications given by Mr. Morrison?

2         THE DEFENDANT:  Yes.

3         THE COURT:  Okay.  As clarified by

4    Mr. Morrison, do you agree to your participation as

5    set forth by the U.S. Attorney?

6         THE DEFENDANT:  Yes.

7         THE COURT:  And do you understand the nature

8    of the charges against you and the maximum penalties

9    you face?

10        THE DEFENDANT:  I do.

11        THE COURT:  And how do you plead to Count

12   One of the Superseding Indictment?

13        THE DEFENDANT:  Guilty.

14        THE COURT:  And how do you plead to the

15   Information?

16        THE DEFENDANT:  Guilty.

17        THE COURT:  Okay.  Did you, in fact, commit

18   the offense as charged in the Information?

19        THE DEFENDANT:  Yes.

20        THE COURT:  And did you, in fact, commit the

21   offense as charged in Count One of the Superseding

22   Indictment?

23        THE DEFENDANT:  Yes.

24        THE COURT:  Okay.  And, Mr. Morrison, do you

25   know of any reason why I should not accept these

1    pleas of guilty?

2              MR. MORRISON:  No, Your Honor.

3              THE COURT:  All right.  I find that the

4    charge as set forth in Count One of the Superseding

5    Indictment and the charge as set forth in the

6    Information were committed by the Defendant, Anthony

7    Gomes.

8              I also find that Mr. Gomes is entering this

9    plea of guilty voluntarily with full knowledge of his

10   rights, the facts, and the consequences that he

11   faces, and for those reasons, I accept the guilty

12   plea.

13             Do we have any other counts that need to be

14   dismissed?  I don't think we do, do we?

15             MR. MYERS:  No, not at this time, Judge.  We

16   typically would move to dismiss those at sentencing.

17             THE COURT:  I knew that because I was told

18   that earlier.  Our practice is once we enter the

19   plea, we dismiss the other counts, and I notice up

20   here, when I've been doing sentencings, at the end of

21   the sentencing somebody will say, well, I need to

22   dismiss the charges.  I knew that, and I also knew I

23   would mess that up.

24             All right.  What will happen at this point,

25   Mr. Gomes, is probation will come out and perform a

1    presentence investigation.  Probation will look into

2    your background, will compile any offenses that you

3    have, and will list those in the presentence report.

4    Probation will also go through your family history,

5    the history of this case, and all of that.

6         Probation will issue a report that will go

7    to Mr. Morrison, and a copy will go to the

8    Government.  When Mr. Morrison gets his copy, he'll

9    either sit down with you and go over it or he'll send

10   it to you.  Most likely, he'll sit down with you.

11   What I ask you to do is look at that report closely,

12   because the information contained in that report will

13   be the information that the sentencing judge will use

14   to determine what an appropriate sentence is for you,

15   so if there's anything in that report that's not

16   accurate, let Mr. Morrison know.

17        What he'll do is he'll file an objection.

18   Normally, he'll sit down with probation and they'll

19   work it out.  But every now and again I'll have a

20   defendant who will say, "Well, I didn't commit that

21   robbery in Chicago," and probation will look and say,

22   "Well, all of our identifiers indicate that's you" or

23   that was him, and so there's a real disagreement, and

24   we'll have to have a hearing to determine what the

25   truth is.  I don't think that will happen, but every

1    now and again it does.  That's why it's important for

2    you to let Mr. Morrison know if anything in that

3    presentence report is inaccurate.  Do you understand?

4              THE DEFENDANT:  I do.

5              THE COURT:  Once that's all done, you'll

6    come back and be sentenced.  My information -- or I

7    have a note here that you'll be sentenced on

8    August 6th of 2018 at 2:30, and Judge Karen Schreier

9    will be here to sentence you.  Do you understand?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Okay.  Is there anything else we

12   need to take up on this case?

13             MR. MYERS:  Not at this time, Judge.

14             MR. MORRISON:  No, Your Honor.

15             THE COURT:  All right.  Well, let's adjourn

16   until 9 o'clock in the morning.

17             (These proceedings were concluded at

18   3:50 p.m.)

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2          I, Carolyn Taylor Pekas, Registered

 3     Professional Reporter, P.O. Box 886, Fargo, North

 4     Dakota, do hereby certify that the foregoing

 5     thirty-eight (38) pages of typewritten material

 6     constitute a full, true and correct transcript of my

 7     original stenotype notes, as they purport to contain,

 8     of the transcript of proceedings reported by me at

 9     the time and place hereinbefore mentioned.

10

11

12                          _____/S/_____

13                          Carolyn Taylor Pekas
                            P.O. Box 886
14                          Fargo, North Dakota  58107

15

16

17     Dated this 13th day of June, 2018.

18

19

20

21

22

23

24

25
```